**JESSICA J. OLIVA**
California State Bar No. 312435
**FEDERAL DEFENDERS OF SAN DIEGO, INC.**
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234-8467
Facsimile: (619) 687-2666
Jessica_Oliva@fd.org

Attorneys for Mr. Orlando Rojo

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO.: 21-cr-00682-GPC |
| Plaintiff, | Hon. Gonzalo P. Curiel<br>Courtroom 2D<br>Date: September 12, 2022<br>Time: 2:30 p.m. |
| v. | |
| ORLANDO ROJO, | **MR. ROJO'S MOTION TO SUPPRESS POST-ARREST STATEMENTS** |
| Defendant. | |

## I.    INTRODUCTION

On the night of his arrest, at the Calexico, California West Port of Entry, two Homeland Security Investigations agents questioned Mr. Rojo after money and a firearm were found in his car. On the day of his interrogation, Mr. Rojo had consumed methamphetamine, which he discussed openly with the agents. He was sweating profusely, displaying facial tics, and disorganized in his manner of speech. Mr. Rojo expressed confusion after he was read his Miranda rights, unsure of whether he would be obligated to answer questions if he signed the waiver form. The agent failed to clarify the purpose of the form and the consequences of signing it, only reassuring him that he could stop the interview at any time. Without grasping that he did not need to speak to the agents at all, or that he could have an attorney present during questioning, Mr. Rojo signed the form and proceeded with the interview. Mr. Rojo's statements must be suppressed, as they were the result of a custodial interrogation conducted without him having knowingly and intelligently waived his *Miranda* rights.

## II.     STATEMENT OF FACTS

On November 21, 2020 at about 8:45 p.m., officers at the Calexico, California West Port of Entry referred Mr. Rojo to secondary inspection when he attempted to cross into Mexicali, Mexico. Upon searching his car, officers found a firearm and $50,000 U.S. dollars concealed within the passenger side rocker panel.

### A.     Miranda Advisement and Waiver

Mr. Rojo was detained for over three hours prior to his interrogation. When he was brought into the interrogation room at around midnight, Mr. Rojo was still experiencing the effects of recent methamphetamine use. He was sweating profusely and making involuntary, repetitive movements that resembled tics. *See, e.g.*, Ex. A at 2:25-2:50.

When Mr. Rojo was asked for his biographical information, he was unable to remember the house number for his address in Mexico where he had lived for several months. Ex. A at 3:40-4:07; Ex. B at 54-81. He similarly did not remember his phone number. Ex. A at 4:10-5:00; Ex. B at 83-106.

Special Agent Boyd read Mr. Rojo his rights and requested that Mr. Rojo read along on the Agency Statement of Rights form and initial next to each sentence to indicate his understanding. Ex. A at 6:58-8:04; Ex. B at 167-179. After Mr. Rojo complied, Agent Boyd asked Mr. Rojo: "Now it's up to you do - do you wish to speak to me knowing - knowing these rights?" For the first time since the interview began, Mr. Rojo paused for an extended period of time. He looked first at the agent and then the paper for several seconds, and finally responded: "Well, there's not much to speak of." Agent Boyd then clarified that he was under arrest and asked him if he knew what he was under arrest for. Mr. Rojo confirmed that he understood he was under arrest for something having to do with money and guns. Ex. A at 8:04-8:30; Ex. B at 180-200. The conversation continued as follows:

AGENT BOYD: Okay, well I mean like - like I said as far as - as far as this is concerned, it's your right to if you - if you choose and answer questions.

1  MR. ROJO: Mm.

2  AGENT BOYD: Right now. And, um, it's up to you.

3  MR. ROJO:  So, if - if I sign it, that means I'm gonna have to answer the

4  questions, right?

5  AGENT BOYD: No, you can stop at any time. Um, it's just totally up to you.

6  I mean, there's, if you don't feel comfortable you can stop it at any time during

7  the questioning. Um, we're just gonna talk about you know, what's going on

8  and what happened and if you don't feel like to answer any questions any further

9  you can stop. Totally up to you.

10  MR. ROJO: I mean, what - whatever question you got the only thing I'm gonna

11  tell you is that I recently bought the car.

12  AGENT BOYD: Okay, well then this is just part of us talking - talking about

13  that.

14  MR. ROJO: Mm-hm.

15  AGENT BOYD: You know, you can choose to, you wan- talk about that you

16  can sign it and then we'll move forward.

17  MR. ROJO: Okay [signs]

18  Ex. A at 8:30-9:25; Ex. B at 202-228.

19      As detailed above, Mr. Rojo was at first hesitant to sign and tried to ascertain

20  the purpose of the form and the consequences of signing it. After Agent Boyd

21  reassured him that he could stop questioning at any point even if he signed the form,

22  Mr. Rojo appeared to have his anxieties quelled and quickly agreed to sign.

23      **B.    Post-*Miranda* Interrogation**

24      As the interview proceeded, Mr. Rojo's recent drug use became clear to the

25  agents through both visual cues and his own admissions. Though he initially said that

26  he was not under the influence of drugs, Mr. Rojo mentioned his methamphetamine

27  use at least a dozen times throughout the interview. *See, e.g.*, Ex. A at 26:50, 29:59,

28  32:00-20, 33:20-43, 36:05-37:49; Ex. B at 946, 1070-71, 1164-73, 1215-30, 1348-1407.

MR. ROJO'S MOTION TO SUPPRESS STATEMENTS

1
2
3
4
5
6
7

Even more significantly, Mr. Rojo made clear that he had repeatedly smoked methamphetamine the night before his arrest and that very morning. Ex. A at 42:30-46:53; 48:45-56; 52:18-53:23; Ex. B at 1579-1750, 1853-1855, 1975-2019; Ex. C at 5:35, 8:45, 10:05, Ex. D at 238, 392, 445. He also mentioned that he does not use methamphetamine on a daily basis so it has a strong impact on him, sometimes causing him to "knock out" for days. Ex. A at 38:20-58; Ex. B. at 1447-1457. He discussed still being high late that morning. Ex. C at 13:39-13:45, Ex. D at 592-593.

8
9
10
11
12
13
14

Mr. Rojo exhibited physical signs of recent drug use during his interview. He sometimes slurred, erratically gesticulated, made noises to describe things, and would stand up and sit back down while speaking. *See, e.g.*, Ex. A. at 24:45-25:55, 46:42-48:05; Ex. B. at 869-899, 1745-1827; Ex. C at 12:10-13:07; Ex. D at 530-585.  He was also sweating profusely and displaying facial tics. *See, e.g.*, Ex. A at 2:25-2:50. His recounting of the events leading up to the offense was at times confusing, often with muddled accusations and profanity. *See, e.g.*, Ex. A 36:05-29; Ex. B at 1348-1363.

15
16
17
18
19
20
21

Mr. Rojo himself described the effects he was experiencing from his recent use of methamphetamine. At one point, Mr. Rojo gestured toward his eyes and said: "Once you're on meth for two days or three days this is what happens." He discussed how methamphetamine makes you sweat excessively and creates a distinctively bad odor, noting "that's the smell that the dog alerted, you know, for me sweating," indicating he was still experiencing effects that evening. Ex. C at 11:40-12:10; Ex. D. at 507-526.

22
23
24
25
26
27
28

At multiple points throughout the interview, Mr. Rojo indicated that he needed time to collect his thoughts before speaking further. He said: "But you guys gotta give me some time, said you want to talk to me. And I gotta think stuff, like, those punks. . ." Special Agent Carlson immediately interjected with "I got another question for you." Ex. A at 40:05-40:19; Ex. B. 1510-1513. Later on, when discussing the ongoing physical effects of his methamphetamine use, he said "and that's as much as I can tell you, bro, till I get something clear on my head and see what this…[sighs]" and the

1    agents similarly continued questioning. Ex. C at 12:10-12:20; Ex. D. at 530-534.

2    Towards the end of the interview, Mr. Rojo said: "I'm ready to go, man. I'm sorry, I

3    can't - I can't talk much more about the situation. There's not much more to tell you."

4    Ex. C at 31:58-32:07; Ex. D at 1274-1279. After a few more questions from the agents,

5    they finally concluded the interview. The entirety of the interview lasted about an hour

6    and a half.

7    ### III.   MOTION TO SUPPRESS MR. ROJO'S POST-ARREST STATEMENTS

8          Mr. Rojo's post-arrest statements must be suppressed because the alleged

9    *Miranda* waiver was not knowing and intelligent. Mr. Rojo misunderstood the purpose

10   of the waiver form and that he was not under an obligation to speak with the agents.

11   His recent drug use contributed to his misunderstanding. Despite his evident

12   confusion, the agents failed to clarify his rights to remain silent and to have counsel

13   present. Instead, Agent Boyd only reassured Mr. Rojo that he could terminate

14   questioning at any point, without clarifying that he never needed to begin speaking

15   with the agents to begin with. As a result, Mr. Rojo signed away his fundamental rights

16   without an awareness of the consequences. As such, Mr. Rojo's alleged waiver was not

17   knowing and intelligent, and his post-arrest statements must be suppressed.

18   ####       A.   The government bears the burden of proving Mr. Rojo's alleged waiver was knowing and intelligent.

19

20         Once a person is in custody, *Miranda* warnings must be given prior to any

21   interrogation, advising the defendant of each of his or her "critical" rights. *See United*

22   *States v. Bland*, 908 F.2d 471, 473 (9th Cir. 1990). The warnings must clearly convey

23   these critical rights, and the agents may not undercut or contradict the purpose behind

24   *Miranda* by offering their own explanation of the warnings' meaning. *See Doody v. Ryan*, 649 F.3d 986 (9th Cir. 2011) (en banc).

25         The government bears the burden of proving that a defendant has knowingly

26   and intelligently waived their *Miranda* rights. *United States v. Garibay*, 143 F.3d 534, 536

27   (9th Cir. 1998). The prosecution must demonstrate, under the "totality of the

28   circumstances," that the defendant was aware of "the nature of the right being

                                                    5                           **21-cr-00682-GPC**

1   abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran v.*

2   *Burbine*, 475 U.S. 412, 421 (1986)). The "mere fact" that a defendant signs "a statement

3   which [contains] a typed-in clause stating that he had 'full knowledge' of his 'legal

4   rights'" does not satisfy the requirement of a knowing and intelligent waiver. *Miranda*

5   *v. Arizona*, 384 U.S. 436, 492 (1966).

6          The government's burden of proof is "great" and courts are required to

7   "indulge every reasonable presumption against waiver of fundamental constitutional

8   rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (citing *Johnson v. Zerbst*,

9   304 U.S. 458, 464 (1938)).  In determining whether a waiver is knowing and intelligent,

10  courts must consider various factors, including: "(i) the defendant's mental capacity;

11  (ii) whether the defendant signed a written waiver; (iii) whether the defendant was

12  advised in his native tongue or had a translator; (iv) whether the defendant appeared

13  to understand his rights; (v) whether the defendant's rights were individually and

14  repeatedly explained to him; and (vi) whether the defendant had prior experience with

15  the criminal justice system." *United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007).

16  If it is not clear that the defendant fully understood their rights, the court must find

17  the waiver invalid. *See United States v. Haak*, No. 13-CR-3395-L, 2013 WL 6263190 at

18  *9 (S.D. Cal. Dec. 4, 2013).

19         Here, the government cannot meet its burden in demonstrating that Mr. Rojo

20  understood the nature of the rights he was abandoning and the consequences of his

21  decision. *See Garibay*, 143 F.3d at 536.

22  **B.    The totality of circumstances demonstrate that Mr. Rojo did not fully appreciate his rights and the consequences of waiving them.**

23         It is clear from Mr. Rojo's response to the *Miranda* advisement that he did not

24  fully understand his rights and the consequences of waiving them. First, Mr. Rojo did

25  not immediately answer yes when Agent Boyd asked if he would like to speak with

26  him. Instead, Mr. Rojo paused for a significant period of time and then responded that

27  there was not much to speak about. Agent Boyd reiterated that Mr. Rojo had been

28  arrested and it was his right to "choose and answer questions." Rather than sign the

1   form at this point, Mr. Rojo asked a clarifying question to make sure he understood

2   the consequences of signing it. He asked: "So, if - if I sign it, that means I'm gonna

3   have to answer the questions, right?" After Agent Boyd clarified that he could stop

4   answering at any point, Mr. Rojo responded: "I mean what - whatever question you

5   got the only thing I'm gonna tell you is that I recently bought the car." Ex. A at 8:00-

6   9:08; Ex. B at 180-218.Despite Mr. Rojo's apparent confusion, the agents failed to

7   "repeatedly explain" his rights and check his understanding. *See Crews*, 502 F.3d at

8   1140. By narrowly reassuring Mr. Rojo that he would be able to stop the questioning

9   at any time, Agent Boyd solidified Mr. Rojo's false impression that speaking with the

10   agents was a foregone conclusion, saying "we're just gonna talk about, you know,

11   what's going on and what happened." *See* Ex. A at 8:44-9:20; Ex. B at 211-227. When

12   Mr. Rojo responded: "I mean, what - whatever question you got the only thing I'm

13   gonna tell you is that I recently bought the car," Agent Boyd simply reassured him by

14   saying "okay, well this is just part of us talking about that" and instructed him to sign.

15   *Id.*

16         Agent Boyd failed to adequately explain the consequences of signing the form

17   and the substance of Mr. Rojo's fundamental rights at stake. Instead, he only reassured

18   Mr. Rojo that signing the form would not create a binding obligation to answer *all* of

19   the agents' questions, without clarifying that Mr. Rojo had a right to remain silent and

20   to have counsel present from the start. Agent Boyd did not seek to ameliorate Mr.

21   Rojo's lack of understanding and in doing so, "obfuscated the meaning of the warning"

22   by failing to elucidate the consequences that Mr. Rojo was attempting to better

23   understand. *See Doody*, 649 F.3d 986 at 1005). Agent Boyd's response did not clarify

24   the *actual* purpose of the form, treated Mr. Rojo's participation as decided, and gave

25   Mr. Rojo a false sense of security that signing would not result in negative

26   repercussions.

27         As a result, when Mr. Rojo signed, he was "unaware of the nature of the rights

28   being abandoned and the consequences of his decision to abandon them," *see Garibay*,

1  143 F.3d at 536. Mr. Rojo's lack of understanding is further evinced by his repeated

2  requests throughout the interview for more time before speaking further to the agents.

3  *See* Ex. A at 40:05-19; Ex. B. 1510-13; Ex. C at 12:10-12:20; Ex. D. at 530-534. If Mr.

4  Rojo had understood his rights, he would have known that he did not have to speak

5  with the agents at all and could have terminated at any time. His repeated attempts to

6  reason with the agents to give him more time to think and get "clear" in his mind

7  demonstrates he did not fully understand his right to remain silent.

8  Moreover, Mr. Rojo's use of methamphetamine contributed to his

9  misunderstanding. Though intoxication does not necessarily alone negate the validity

10  of a waiver, *see Matylinsky v. Budge*, 577 F.3d 1083, 1095 (9th Cir. 2009), a defendant's

11  diminished mental capacity is certainly a factor to consider. *See Crews*, 502 F.3d at 1140.

12  The effects of drugs and alcohol on a defendant's physical and mental state, and their

13  ability to understand, must be taken into consideration when evaluating a waiver. Here,

14  Mr. Rojo was visibly and self-admittedly still feeling the effects of his

15  methamphetamine use that morning. Mr. Rojo had explained that he was still sweating

16  from the methamphetamine as he attempted to cross the border a few hours earlier,

17  and gestured towards his eyes to show the agents how it was affecting him. Ex. C at

18  11:40-12:10; Ex. D at 507-526. He displayed facial tics and was speaking in a

19  roundabout manner, erratically gesticulating, standing up at times, and making sound

20  effects as he recounted his story. As Mr. Rojo explained, smoking methamphetamine

21  would usually cause him to "knock out" for multiple days because he did not do it on

22  a daily basis. Ex. A at 38:20-38:58; Ex. B. at 1447-1457. The effects of smoking

23  methamphetamine that morning continued to affect his mental and physical state at

24  the time of the interview. In addition to still feeling the immediate effects of

25  methamphetamine use that day, Mr. Rojo's addiction in general may also impair his

26  cognitive functions and decision-making abilities in general. *See* Mizoguchi et al.,

27  *Methamphetamine use causes cognitive impairment and altered decision-making*, 124

28  NEUROCHEMISTRY INT'L 106, 107 (2019). While someone without a clouded mental

1  state might have been able to understand the *Miranda* advisement and waiver without

2  clarification, the effects of Mr. Rojo's drug use, both that day and cumulatively over

3  time, contributed to his inability to grasp what was happening.

4  In evaluating the totality of the circumstances, *United States v. Haak* is instructive.

5  *See U.S. v. Haak*, No. 13-CR-3395-L, 2013 WL 6263190 (S.D. Cal. Dec. 4, 2013). *Haak*

6  demonstrates that a defendant's apparent confusion, supported by a temporarily

7  diminished mental capacity, makes a waiver invalid even if officers attempt to resolve

8  the confusion. *See Haak*, No. 13-CR-3395-L, 2013 WL 6263190 (S.D. Cal. Dec. 4,

9  2013). In *Haak*, an agent confirmed multiple times with the defendant, in his native

10 language, that he understood his rights and that he would be waiving them by signing

11 the form, which he eventually did. *Id.* at *8. The defendant had also been arrested in

12 the past, indicating his familiarity with *Miranda* rights. *Id.* Though this satisfied the

13 majority of the *Crews* factors, the Court still found the waiver to be invalid because it

14 could not find with certainty that "[Haak] fully understood the consequences of the

15 waiver" due to his confused questions about whether he would still be able to leave.

16 *Id.* at *13. The Court, in part, attributed this to Haak's "temporarily diminished mental

17 state" brought on by his anxiety disorder. *Id.* As in *Haak*, here it cannot be said with

18 certainty that Mr. Rojo fully understood the consequences of the waiver. Despite

19 having been arrested before, being advised in a language he spoke fluently, and

20 ultimately signing the form, Mr. Rojo did not appreciate his rights and the significance

21 of the waiver in part due to his "temporarily diminished mental state" from his recent

22 use of methamphetamine. In *Haak*, an anxiety disorder contributed to the defendant's

23 inability to fully grasp what was happening. *Id.* at *7. Similarly, Mr. Rojo's recent drug

24 use contributed to his inability to understand. Perhaps more significantly, unlike in

25 *Haak*, Agent Boyd did not at all attempt to ensure that Mr. Rojo understood his rights

26 or the waiver form before encouraging him to sign. In *Haak*, the interrogating officer

27 verbally confirmed with the defendant three times that he "[understood his] rights,"

28 clearly stated "that's a decision you have to make," and explicitly told him to sign "if

1  you want to waive your rights." *Id.* at \*5-6. Despite this, court still found that the

2  waiver was invalid due to Haak's confusion. *Id.* at \*13. In Mr. Rojo's case, Agent Boyd's

3  response did not remotely approach this level of clarity. Agent Boyd only directly

4  answered Mr. Rojo's misstatement about what the form would do, without clarifying

5  its actual purpose or Mr. Rojo's rights. As a result, the *Crews* factors weigh even more

6  heavily in Mr. Rojo's favor due to the lack of clarification. *See Crews*, 502 F.3d at 1140

7  (including factor of "whether the defendant's rights were individually and repeatedly

8  explained to him").

9      Though someone in a normal state of mind might have been able to

10  comprehend the significance of the waiver and their decision to sign it, the ongoing

11  effects of a methamphetamine binge made it more difficult for Mr. Rojo to grasp the

12  significance of the waiver form and the substance of his constitutional rights.

13  Combined with the agent's ambiguous clarifications, Mr. Rojo signed the waiver form

14  and spoke with the agents without a full understanding of his rights and the

15  consequences of waiving them. As a result, under the totality of the circumstances, Mr.

16  Rojo's waiver cannot be knowing and intelligent.

17  **IV.   CONCLUSION**

18      For the above reasons, Mr. Rojo respectfully requests this Court grant his

19  motion and suppress his statements.

21          Respectfully submitted,

23  Dated:  August 8, 2022      *s/ Jessica J. Oliva*

24          Federal Defenders of San Diego, Inc.
        Attorneys for Mr. Orlando Rojo
        Email: Jessica_Oliva@fd.org